NUMBER 13-09-00277-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG


 


HOMERO EDUARDO FALCON

MARTINEZ AND FARLEY, S.A. DE C.V., Appellants,


v.


HUGO GARCIA DE ANDA, MINERVA Y ENERGIA

DEL NORESTE, S.A., STAR FUELS LIMITED, 

MICHAEL LOUGHRAN AND JOSEPH LOUGHRAN, Appellees.

 




On appeal from the County Court at Law No. 1 of


Nueces County, Texas.


 




MEMORANDUM OPINION



Before Justices Yañez, Benavides, and Vela


Memorandum Opinion by Justice Benavides


 Appellants, Homero Eduardo Falcon Martinez ("Falcon") and his company, Falrey,
S.A. de C.V. ("Falrey"), (1) bring this interlocutory appeal (2) from a trial court's order granting
special appearances in favor of appellees, Hugo Garcia de Anda ("Garcia"), Mineria y
Energia Del Noreste, S.A. ("MENSA"), Star Fuels Limited ("Star Fuels"), Michael Loughran
("Michael"), and Joseph Loughran ("Joseph"). See Tex. Civ. Prac. & Rem. Code Ann. §
51.014(a)(7) (Vernon 2008). By numerous issues, Falcon and Falrey argue that the trial
court erred by granting the special appearances because (1) none of the appellees met
their burden to negate all bases of jurisdiction, and therefore, the burden never shifted to
appellants to prove that personal jurisdiction is proper; (2) the contacts and acts of agents
in Texas can be attributed to the non-resident principals, and the contacts of the corporate
defendants can be attributed to their owners under an alter ego theory; (3) there is legally
and factually insufficient evidence to support the trial court's order; (4) the trial court had
specific and general jurisdiction over all appellees; and (5) exercising jurisdiction would not
offend traditional notions of fair play and substantial justice. We affirm.

I. Background


 Falcon is a resident and citizen of Mexico, and his corporation, Falrey, is a Mexican
corporation with its principal place of business in Mexico. Falcon and Falrey filed suit
against the appellees on January 29, 2004. In their fifth amended petition, Falcon and
Falrey alleged that (1) Garcia is a citizen and resident of Mexico; (2) MENSA is a Mexican
corporation with its principal place of business in Monterrey, Mexico; (3) Star Fuels is a
United Kingdom corporation with its headquarters in Northern Ireland; and (4) Michael and
Joseph are individuals who are citizens and residents of Northern Ireland. The petition
alleges that Star Fuels is owned entirely by Michael. The other two defendants below,
LLKL Trading, Inc. and Star Fire Port Services, Inc. ("Star Fire"), are Texas Corporations
with principal places of business in Corpus Christi, Texas. Star Fire is a wholly-owned
subsidiary of Star Fuels. 

 Falrey and Falcon alleged that in August 2002, a group of coal-industry executives
held meetings in Corpus Christi, Texas to discuss the potential for participating in a
contract to supply coal to an electrical power plant in Mexico. Falcon, King, and Michael
attended these meetings. Michael expressed an interest in gaining access to a coal
deposit in Mexico a few miles outside of Laredo, Texas, known as the San Guillermo
Concession. Falrey and Falcon alleged that for many years, Star Fuels had purchased
coal from Farco Mining Company. Farco owned and operated a coal mine on the United
States' side of the border and the San Guillermo Concession, but Farco was planning to
cease production because the coal deposit had been fully exhausted. According to the
petition, Michael expressed urgency in obtaining an agreement in order to meet existing
commitments in Europe and to avoid losing the market once Farco ceased operations. 

 Garcia owned a contractual right to the San Guillermo Concession and had a royalty
agreement with its owner. King knew Garcia and had been advising him for several years
on marketing a particular type of coal produced by the mine called "cannel coal." Falcon
also knew Garcia through past family business. 

 According to the petition, Michael and Joseph agreed to provide the necessary
capital to develop a mining operation at the San Guillermo Concession. Based on this
representation, Falcon contacted Garcia and met with him. Falcon explained that his
company, Falrey, desired to be the contractor and provide the mining operation, and the
Loughrans and their company, Star Fuels, could provide the capital. Based on this
discussion, Garcia agreed to meet in Laredo, Texas to continue discussions.

 On September 2, 2002, Garcia, his son Jose Antonio Garcia ("Jose"), King, Joseph,
James Leatherwood, (3) and Falcon met in Laredo, Texas. Falcon and Falrey assert that at
this meeting, the parties entered into a contract with the following terms:


 The Loughrans and King were to be given development rights to the mine by
Garcia's Company, MENSA;

 phase one of the program was to last four or five months at the rate of 15,000 to
18,000 tons per month with the reasonable expectation of the parties that once the
mine was in production, the contract would extend until the mine was exploited;

 the coal would be screened at the mine site in Mexico to a two-inch dimension with
all coal larger than two inches to be taken by Michael and King for royalties payable
to MENSA, and all coal smaller than two inches to be taken by MENSA to be sold
inside Mexico with payments to Michael and King "FOB";

 MENSA would provide environmental and explosive permits;

 Michael and King agreed to develop the mine, and Falrey would be the mining
contractor;

 the Loughrans and Star Fuels would provide the capital for obtaining mining
equipment and start-up operating costs; and

 Falrey was to be compensated on a cost-plus-expenses basis for all the coal
produced, and would receive a brokerage commission on any coal sales to third
parties.



 Falcon and Falrey alleged that Garcia confirmed the essential terms of this
agreement by e-mail letter to King dated September 8, 2002. According to Falcon and
Falrey, following this agreement, Garcia, MENSA, King, and the Loughrans agreed to
establish a Texas corporation to be named LLKL Trading, Inc., which was to be owned
according to the following percentages: (1) 33% by Michael; (2) 32% by Joseph; (3) 30%
by King; and (4) 5% by Leatherwood. Once incorporated, LLKL Trading was to represent
the rights of King and the Loughrans "and/or" Star Fuels, and it was to have title to the
large-dimension coal produced by the Mexican mining operation. 

 According to Falcon and Falrey, title to all coal transported across the United States
border would be in the name of Falrey. LLKL Trading would take title to the coal once it
was in the United States. LLKL Trading would then transport the coal to a washing plant
operated by Farco in Texas. The large-dimension coal from the washing plant would be
transported by LLKL Trading to the Star Fire terminal in Corpus Christi. Any revenue and
commissions generated by LLKL Trading's sales were to be divided among the owners of
LLKL Trading, and LLKL Trading was also to assume the obligation to provide capital for
the mining development and logistical costs. Falcon and Falrey alleged that the Loughrans
"realized that this additional coal transporting would have the added benefit of making Star
Fire (their own company--located in Corpus Christi, Nueces County, Texas) a
commercially viable terminal."

 The Loughrans insisted that King quit his current job to become the manager of
LLKL Trading, to provide any necessary advice regarding the mining project, and to
develop additional sales. In return, LLKL Trading would pay King a monthly stipend of
$7,000, pay his necessary expenses, and provide capital to the mining project. 

 Michael wanted to begin production as soon as possible. On September 9, 2002,
Falrey began construction of the mining infrastructure by clearing a 2.5 mile roadway to
provide access to the mining site. Falrey commenced mining at the first pit one week later
on September 16, 2002.

 Falrey and Falcon asserted that from the beginning, Joseph and Leatherwood
appeared at the mining site and began giving direct instructions to Falrey's employees,
causing confusion in the mining crew. This interference allegedly degraded efficiency and
had a negative impact on operational safety. Specifically, Falrey and Falcon alleged that
Joseph and Leatherwood (1) instructed Falrey employees to deposit mine material,
requiring the material to be moved again; (2) instructed Falrey's crews to upgrade the
access road in excess of what was necessary; (3) failed to provide funds on a timely basis;
and (4) mistreated workers. Ultimately, Garcia visited and was not satisfied with the
progress, and Falcon explained the situation. Garcia asked Falcon to take full operational
control of the mine, and after Falcon asked Leatherwood to stop interfering, Garcia was
satisfied with the improvements.

 Falcon and Falrey alleged that they worked diligently to increase production, working
on a 24-hour per day basis, and requiring their workers to work double shifts. However,
because Michael and Joseph delayed funding, Falcon and Falrey were forced to use their
own credit in order to lease and purchase necessary additional equipment. According to
Falcon and Falrey, they furnished the parts, tools, and labor and established lines of credit
with suppliers in Texas and Mexico. Falrey contacted vendors and arranged agreements
with brokers, freight forwarders, and other transportation contractors in Texas and Mexico
to move the coal. Falrey also worked to set up personal transportation to and from the
mine, provided medical assistance for employees, and planned and implemented an
environmental safety plan.

 King became actively engaged in assisting with the mine development in November
2002, and incorporated LLKL Trading, Inc. According to the petition, King sold coal
washed at the Farco facility to Farco to be combined with its own coal, and the Loughrans
used the money from this sale to offset charges Farco imposed for washing the coal. 
Falcon and Falrey alleged that this deprived LLKL Trading of critically needed working
capital to sustain the mining operation and to pay its creditors, including Falrey and Falcon.

 In early November 2002, the funding provided to the mining operation by Star Fuels
and the Loughrans was delayed to the point of requiring King to stop mining operations for
several days. After some discussions, a small amount of money was wired to King in
Texas. The Loughrans related that more money would be forthcoming after their visit to
Laredo the following week and the establishment of a mine budget. In the interim, King
and Falcon used their own personal lines of credit, as well as Falrey's business credit, to
continue the mining operation. 

 Falcon claims that he remained optimistic despite the lack of funding because the
Loughrans indicated that they or Star Fuels would increase their overseas orders for coal
in the following year. And King indicated that potential clients had contacted him about
purchasing coal. Accordingly, Falcon contacted equipment dealers, import experts, freight
forwarders, customs officials, and other individuals to increase production and transport
efficiency.

 As requested by the Loughrans, coal from the mining operation was taken to Star
Fire in Corpus Christi. The Loughrans arranged for a ship to transport coal to the United
Kingdom, and the ship was loaded with coal on December 24, 2002. According to Falcon
and Falrey, this coal was not paid for by any of the appellees.

 On January 2, 2003, King faxed a seven page recap of all costs incurred up to that
point, including $175,000 in payables due prior to the end of 2002. On January 6, 2003,
King received notice from Joseph on Star Fuels letterhead stating that $175,000 would be
wired, but no more funding would be provided until certain conditions were met, including
the formation of a Mexican company to assume full control of the mining project and to
obtain an environmental permit, explosive permit, border crossing permit, and a contract
with Garcia for a permanent agreement. Falcon asserts that none of these conditions were
within his control. 

 Falcon and Falrey assert that the refusal to fund the mining project and to pay
expenses was a breach of the Loughrans' and Star Fuels's commitment to fund the
operation costs. The inability to pay contractors and vendors made it impossible for King
and LLKL Trading to fulfill its obligation to Garcia or to reimburse King, Falcon, and Falrey
for the personal debt they had incurred. To keep the mining operation going, King slowed
mining operations and committed more personal funds. King continued during January
2003 to advise the Loughrans and Star Fuels of their obligation to make equipment
payments to Falrey and other creditors.

 Over a two-week period following January 6, 2003, Garcia made repeated inquiries
as to why the mining operation had slowed down. King and his assistant, J.J. Amaro, met
with Garcia and his son Jose on January 24, 2003. It is unclear from Falcon and Falrey's
petition where this meeting took place. King explained that funding had stopped and
explained the conditions the Loughrans had requested in order to continue operations. 
Falcon and Falrey alleged that at this meeting, Garcia presented false information accusing
Falcon and Falrey of stealing 4,000 tons of coal from the mine. King and Amaro denied
the allegations.

 After repeated requests from King, on January 28, 2003, Joseph wired
$48,500--less than what was requested and what was required to pay creditors. The next
day, Joseph faxed a letter to King requesting a detailed financial and engineering analysis,
which he wanted to be presented upon his and Michael's arrival in Laredo on January 31,
2003.

 The Loughrans arrived in Laredo on January 31, 2003, and Falrey presented a 419-page expense justification. On February 1, 2003, the Loughrans visited the mine, and then
a meeting took place that was attended by Garcia, Jose, the Loughrans, King, Amaro, and
Falcon. It is unclear from the petition where this meeting took place. At the meeting,
Garcia again alleged that Falcon had stolen coal, then claiming that only 1,100 tons were
stolen. When challenged on his allegation, Garcia became upset and left the meeting.
Michael suggested another meeting on February 3, 2003, and Garcia reluctantly agreed.

 On February 2, 2003, King and the Loughrans met briefly to review Falrey's cost
substantiation. Then, on February 3, 2003, a meeting in Laredo was held. Initially, King
and the Loughrans arrived, and Michael became enraged at King. When Garcia and Jose
arrived, Joseph presented a document claiming that a million dollars had been spent and
stating that King could not account for the money. Falcon and Falrey alleged that this was
impossible because LLKL Trading had never been provided with that amount of capital. 
Garcia then repeated the accusations against Falcon. Michael suggested to Garcia that
the mining operation be shut down, and he agreed.

 Falcon and Falrey alleged that after the meeting, the Loughrans, King, and Garcia
went to the mine, ejected the Falrey work force, took all the keys to the storage trailers and
equipment, and changed the gate locks. A guard was posted at the gate and was told to
prevent anyone from entering. Before leaving the mine, Garcia and Michael asked King
if Falcon, individually or on behalf of Falrey, would assign the equipment at the mine to
MENSA. King told them that he doubted Falcon would agree because the Loughrans, Star
Fuels, and LLKL Trading owed Falco and Falrey payment for their services.

 The next day, February 4, 2003, the Loughrans, Garcia, and King met in Laredo with
Garcia's accountants and lawyer. King presented the Loughrans with a recap of LLKL
Tradings's expenditures and bank statements. Michael again claimed King was being
uncooperative and that he could not account for the money spent. When Falcon arrived
at the meeting, Garcia and Joseph again accused him of stealing coal from the mine. At
the end of the meeting, Falcon was asked if he would assign the equipment, and Falcon
stated he would, subject to being paid the amounts he was owed. Falcon and Falrey
allege that later that evening, the Loughrans went to King's hotel room and accused him
of misappropriating company funds in collusion with Falcon, threatening him with criminal
charges. 

 On February 6, 2003, King spoke to Amaro, who told him that he had been
contacted by Garcia complaining of his desperate need for coal and asking Amaro to sell
Falrey's equipment. The petition states that King later learned that the Loughrans and/or
Star Fuels had given Garcia permission to remove the remaining coal inventory at the mine
site. King then spoke to Joseph, who was in the United Kingdom at the time, and
suggested that Garcia be invoiced for previous and current coal purchases. Joseph
declined, stating that the amount of royalties owed to Garcia and the amount he purchased
were not much different. Falcon and Falrey, however, assert that the difference was in
excess of $100,000.

 King received inquiries from groups who were interested in providing larger mining
equipment and working capital to restart the mine. Garcia informed King that he alone
would reopen the mine. After learning that the mine was shut down, several equipment
lessors went to the mining property and were allowed to remove most of the rental
equipment. Falcon and Falrey alleged that this equipment was obtained through a
lease/purchase agreement, and only a few more payments were owed. Falcon and Falrey
claim that because the Loughrans and Star Fuels failed to pay the promised capital timely,
Falcon and Falrey lost the equity they had built up in the equipment.

 Falcon and Falrey claimed that at this time, Falcon discovered that Garcia was
removing inventoried coal from the mine and was using Falrey's equipment to do so. 
Falcon obtained a court order and a police escort to remove the remaining equipment. On
February 15, 2003, Michael told King in a telephone conversation that he was going to
broker a deal with Garcia during March 2003.

 On April 28, 2003, a special shareholders meeting of LLKL Trading was held in
Laredo, Texas. King attended as managing director. Michael and Joseph voted their
majority interest to terminate King's role as director and named themselves as corporate
director. Immediately following the shareholders meeting, Joseph and Michael held a
special board of directors meeting, and voted themselves as officers of the company,
terminating King's role as president and manager. King then turned over LLKL Trading's
banking records and check book. King was never paid the salary he was promised.

 Falcon and Falrey alleged that LLKL Trading was never paid for any of the 13,000
tons of coal produced and sold to Garcia, Farco, and Star Fuels. Falcon and Falrey further
stated that they were never paid for their services or reimbursed for expenses. The petition
stated that nevertheless, the Loughrans and Garcia continued to request that Falcon and
Falrey assign the remaining equipment to them. Falcon and Falrey claimed all these acts
were part of a calculated plan to cut King, Falcon, and Falrey out of the mining project. 

 Falcon and Falrey's petition stated claims for civil theft, tortious interference,
conversion, breach of contract, fraud, slander and libel, quantum meruit, unjust enrichment,
and promissory estoppel. The petition included the following jurisdictional allegations:

 [The defendants] all have substantial, continuous and systematic contacts
with the State of Texas which include doing business in Texas. These
contacts are more than sufficient to confer specific and/or general personal
jurisdiction over these defendants. All of these defendants entered into
various contracts and agreements with one or more Texas resident[s]
whereby part of the contract was to be performed in the State of Texas,
committed one or more torts in whole or in part in Texas . . . and/or recruited
Texas residents, directly and/or through one or more intermediaries located
in this State, for employment inside or outside this State. In addition, those
acts by these defendants alleged herein which were conducted outside the
State of Texas had reasonably foreseeable consequences in Texas. 
Moreover, the Plaintiffs' causes of action arise from and are related to these
Defendants' contacts with Texas.


 The petition further alleged that the Loughrans operated a number of companies,
including LLKL Trading, Star Fuels, Star Fire, and at all material times, the Loughrans
disregarded corporate formalities such that they and their companies can be treated as
one business enterprise or entity. Falcon and Falrey alleged that the Loughrans'
companies were their alter egos because the Loughrans (1) commingled corporate assets
of both LLKL Trading and Star Fire with those of Star Fuels and their personal assets; (2)
diverted corporate assets from LLKL Trading and Star Fire to Star Fuels and to
themselves; (3) disregarded corporate formalities; (4) utilized the corporate form to commit
fraud against Falcon and Falrey; (5) have unified their companies such that it would be
fundamentally unfair to treat them all as separate entities; (6) have been the majority, sole,
or controlling owners of several companies, including two Texas corporations; (7) have
engaged in self-dealing; (8) have blended individual finances, accounts, and assets of the
various business entities; (9) have utilized business forms to further individual objectives
without regard to legitimate corporate or business goals; and (10) have utilized corporate
structure to evade personal responsibility and liabilities in Texas and abroad. Furthermore,
Falcon and Falrey alleged that any judgment obtained against the Loughrans' companies
would be enforceable against the Loughrans individually, and vice versa.

 With respect to Garcia and MENSA, Falcon and Falrey alleged that MENSA was the
alter ego of Garcia because he (1) commingled assets; (2) disregarded corporate
formalities; (3) utilized the corporate form to commit fraud against the plaintiffs; (4)
engaged in corporate self-dealing; (5) blended individual finances, accounts, and assets
of his business with his own; (6) utilized business forms to further individual objectives
without regard to legitimate corporate or business goals; and (7) utilized the corporate
structure to evade personal responsibilities and liabilities. Furthermore, Falcon and Falrey
alleged that any judgment obtained against MENSA would be enforceable against Garcia
individually, and vice versa.

 All the appellees specially appeared. Each special appearance stated simply that
the defendant (1) is not a resident of Texas and is not required to maintain and does not
maintain a registered agent for service in Texas; (2) does not engage and has not engaged
in business in Texas or committed any tort, in whole or in part, within the state; and (3)
does not maintain a place of business in Texas and has no employees, servants, or agents
in Texas. Furthermore, each special appearance stated that the exercise of jurisdiction
would offend traditional notions of fair play and substantial justice, depriving the defendant
of due process of law. Each special appearance was verified, but the verifications do not
provide any factual detail except to state that (1) Garcia is the director general of MENSA,
and (2) Joseph is the managing director of Star Fuels. 

 After filing the special appearances, the defendants filed affidavits in support of their
special appearances. Specifically, Michael stated that he resides in Ireland and is the
chairman of Star Fuels, which is a limited company located in northern Ireland. He claimed 
that on January 29, 2002, Star Fuels purchased all the outstanding shares of Star Fire,
which is an entity that operates a coal processing and handling facility at the Port of Corpus
Christi, Texas. Michael stated that he serves as the president of Star Fire. He stated that
he was the vice president of LLKL Trading since October 2002 and became president on
April 28, 2003.

 Michael stated that LLKL Trading was created to provide capital for a coal mining
project in Mexico, and Star Fuels agreed to advance funds to LLKL Trading for the project,
which would be reimbursed by LLKL Trading through the delivery of coal produced from
the project. He claimed that Star Fuels began advancing funds for the project to Falcon
and Falrey, and after LLKL Trading was formed, Star Fuels advanced funds directly to
LLKL Trading. The affidavit contests the allegations of liability but does not dispute that
any of the meetings in Texas or elsewhere took place. Michael responded to Falcon and
Falrey's allegations of alter ego and joint enterprise theories of jurisdiction as follows:

 I have always maintained the integrity of the companies or entities of which
I am a shareholder, director or officer with separate, corporate records,
books and accounts maintained. Any funds that were delivered directly to
Mr. Falcon or to Mr. King through Star Fuels was done because of Mr. King's
delay in establishing LLKL as an entity and to create a bank account for such
entity. I have never commingled any of my personal funds with any of the
corporate funds of Star Fuels, Star Fire or LLKL.


Joseph submitted an affidavit stating that he was a resident of Ireland and containing the
same denial of alter ego and joint enterprise theories as contained in Michael's affidavit.

 Garcia submitted an affidavit stating that he is a resident of Monterrey, Mexico and
is a Mexican citizen. He stated that he is the president of MENSA, which is a Mexican
company. He denied liability, but he did not dispute the alter ego or joint enterprise
theories alleged in Falcon and Falrey's petition. 

 Falcon and Farely filed responses to the special appearances and attached
evidence including 2,251 pages of deposition testimony and other documents. In their
response, for the first time, Falcon and Falrey alleged that Garcia owned an apartment in
San Antonio and maintained a personal bank account in Texas. They cited testimony from
Garcia that he traveled to Laredo about three times per year. 

 The trial court, after a hearing, granted the special appearances, and this
interlocutory appeal ensued.

II. Standard of Review


 The plaintiff bears the initial burden of pleading sufficient facts to bring a nonresident
defendant within the provisions of the long-arm statute. BMC Software Belgium, N.V. v.
Marchand, 83 S.W.3d 789, 793 (Tex. 2002). When a defendant challenges a Texas
court's personal jurisdiction, the defendant must negate all jurisdictional bases. Id. 
"Because the plaintiff defines the scope and nature of the lawsuit, the defendant's
corresponding burden to negate jurisdiction is tied to the allegations in the plaintiff's
pleading." Kelly v. Gen. Interior Const., Inc., 301 S.W.3d 653, 658 (Tex. 2010).

 "The defendant can negate jurisdiction on either a factual or legal basis." Id. at 659. 
In a factual challenge, the defendant presents evidence that it has no contacts with Texas
to disprove the plaintiff's allegations. Id. The plaintiff then presents evidence that affirms
its allegations and risks dismissal if it cannot present evidence supporting the allegations
of jurisdiction. Id. "If the plaintiff's evidence does not fall within the scope of the factual
allegations in the pleading, then the plaintiff should amend the pleading for consistency." 
Id. at 659 n.6. In a legal challenge, the defendant asserts that even if the plaintiff's
allegations are true, the evidence is legally insufficient to establish jurisdiction; i.e., "the
defendant's contacts with Texas fall short of purposeful availment; for specific jurisdiction,
that the claims do not arise from the contacts; or that traditional notions of fair play and
substantial justice are offended by the exercise of jurisdiction." Id. at 659. 

 "Whether a court has personal jurisdiction over a defendant is a question of law." 
BMC Software Belgium, N.V., 83 S.W.3d at 794. A trial court's determination of its
jurisdiction, however, frequently requires the court to resolve questions of fact. Id. When
a trial court does not issue findings of fact and conclusions of law in conjunction with its
ruling on a special appearance, all facts necessary to support the judgment and supported
by the evidence are implied. Id. at 795. "When the appellate record includes the reporter's
and clerk's records, these implied findings are not conclusive and may be challenged for
legal and factual sufficiency in the appropriate appellate court." Id.

III. Negating Jurisdictional Allegations and Imputing Contacts


 Before we can proceed with a minimum contacts analysis, we must first determine
which contacts are relevant. By their second issue, Falcon and Falrey assert that they
pleaded allegations sufficient to bring the appellees within the provisions of the Texas
Long-Arm statute, and thus, the burden shifted to appellees to negate all bases of
jurisdiction. Falcon and Falrey argue that the appellees did not meet their burden to
negate all the bases of jurisdiction to shift the burden back to Falcon and Falrey to produce
evidence. In particular, Falcon and Falrey argue that to raise a factual dispute, the
appellees were required to specifically challenge the contacts with Texas alleged in the
petition. Falcon and Falrey point to the special appearances, which did not deny that any
of the alleged contacts with Texas took place. As we explain below, we agree, in part. 

 The special appearances filed by the appellees did not deny any of the contacts with
Texas alleged in the petition, with two exceptions. First, Michael stated that Star Fuels
agreed to advance money to LLKL Trading to perform the mining contract, and that LLKL
Trading would reimburse the funds to Star Fuels. He stated that before LLKL Trading was
formed, Star Fuels advanced funds directly to Falcon and Falrey, and after LLKL Trading
was formed, Star Fuels advanced funds directly to LLKL Trading. Thus, with the exception
of these contested facts, the trial court was required to accept the alleged contacts as true,
and Falcon and Falrey were not required to present evidence proving the contacts
occurred. 

 Second, Falcon and Falrey rely on evidence they submitted that they claim shows
that Garcia owns an apartment in Texas, that Garcia and MENSA have bank accounts in
Texas, and that Garcia traveled to Texas and made purchases in Texas unrelated to the
mining contract. However, these facts were not pleaded, and therefore, we need not
accept them as true. Otherwise, we take as true that the contacts alleged in the petition
occurred, with the noted exceptions, and we will base our decision on those contacts,
interpreting the appellees' jurisdictional challenge as a legal challenge instead of a factual
one. See Kelly, 301 S.W.3d at 659. Accordingly, we sustain Falcon and Falrey's second
issue in this respect.

 By their fifth, sixth, and seventh issues, however, Falcon and Falrey argue that the
acts of the individual appellees, as well as those of King and Leatherwood, can be imputed
in various ways under agency and alter ego principles. Falcon and Falrey argue that the
appellees failed to specifically negate any of their agency and alter ego allegations, and
even so, Falcon and Falrey presented substantial evidence to prove agency and alter ego. 
In response, the appellees argue that when a plaintiff's assertion of jurisdiction depends
on imputing the actions of a resident to a nonresident, the burden of pleading and proof
is always on the plaintiff. We agree with appellees. 

 In IRA Resources v. Griego, the Texas Supreme Court held that a plaintiff failed to
demonstrate that a Texas resident acted as the agent of a California corporation for
purposes of establishing personal jurisdiction over the California corporation. 221 S.W.3d
592, 597 (Tex. 2007). The court held that "Texas law does not presume agency, and the
party who alleges it has the burden of proving it." Id.; see also PHC-Minden, L.P. v.
Kimberly-Clark Corp., 235 S.W.3d 163, 167 (Tex. 2007). Likewise, in BMC Software
Belgium, N.V., the court held that "[t]he party seeking to ascribe one corporation's actions
to another by disregarding their distinct corporate entities must prove this allegation." 83
S.W.3d at 798. The court explained that this rule exists because "Texas law presumes that
two separate corporations are indeed distinct entities." Id. Thus, in this context, the
burden of pleading and proof never shifts to the nonresident defendant, but always remains
on the plaintiff seeking to establish jurisdiction by this method. Id. at 796 ("The court of
appeals determined that the trial court could have reasonably concluded that BMCB failed
to negate all possible bases for establishing specific jurisdiction."); id. at 798-800.

 Thus, while we accept that all the alleged contacts occurred, we must decide if
Falcon and Falrey proved that the actions of the alleged agents can be attributed to their
principals, and whether the actions of the individuals can be attributed to the relevant
corporations and vice versa.

A. Agency--Imputing Agent's Actions to Principal

 First, Falcon and Falrey argue that King acted as an agent for the Loughrans and
for Star Fuels. For support, Falcon and Falrey cite their fifth amended petition. However,
because Falcon and Falrey bore the burden of pleading and proof in the trial court on this
issue, the pleadings are not sufficient by themselves to sustain Falcon and Falrey's burden. 
See Laidlaw Waste Sys. (Dallas), Inc. v. City of Wilmer, 904 S.W.2d 656, 660 (Tex. 1995)
(holding that pleadings are not evidence). The only piece of evidence cited as
demonstrating King's agency relationship with the Loughrans and with Star Fuels is a page
from Michael's deposition, wherein he describes the September 8, 2002 e-mail from Garcia
to King regarding the mining contract. In the testimony, Michael states that initially, King
did not have authority to negotiate with Garcia regarding the mining project, and he was
"advised" of King's discussions with Garcia on September 2, 2002 after they occurred. 
Michael testified that later, he agreed to participate in the deal. Michael stated that he
believed that the agreement was between Garcia's company, MENSA, Star Fuels, and
King. 

 Nothing in this testimony indicates that, prior to the contract, King had authority to
act as the Loughrans' agent or as an agent for Star Fuels. See Happy Indus. Corp. v. Am.
Specialties, Inc., 983 S.W.2d 844, 852 (Tex. App.-Corpus Christi 1998, pet. dism'd w.o.j.)
("To prove agency, evidence must establish that the principal has both the right: (1) to
assign the agent's task; and (2) to control the means and details of the process by which
the agent will accomplish that task."). Additionally, there is nothing to indicate that Michael
"ratified" King's conduct as his agent because, as he testified, he believed the agreement
was between MENSA, Star Fuels, and King individually. The trial court impliedly found that
these were mere negotiations occurring between three separate parties, and the evidence
is legally and factually sufficient to support this finding.

 Second, Falcon and Falrey argue that Leatherwood regularly acted as the
Loughrans' agent in Texas because he worked for Star Fire, which they allege is the alter
ego of Star Fuels and Michael, and did business with various Texas entities on a daily
basis. They also allege that he traveled to the mine at the beginning of the operation and
oversaw matters on behalf of the Loughrans and Star Fuels. Falcon and Falrey, however,
do not provide any citations to the record to support this argument. Accordingly, it is
waived. Tex. R. App. P. 38.1(i) (requiring the argument section of a brief to contain record
references).

 With respect to MENSA, we note that Garcia admitted in his affidavit that he is the
director general of MENSA. Joseph likewise testified that he is the managing director of
Star Fuels. Finally, Michael testified that he is the chairman of Star Fuels, which
purchased all the outstanding shares of Star Fire. Michael stated that he serves as the
president of Star Fire and that he was the vice president of LLKL Trading since October
2002 and became president on April 28, 2003. Thus, these agency relationships were
admitted by the appellees's testimony.

B. Reverse Agency--Imputing Corporate Acts to Individual Owners

 First, Falcon and Falrey argue that Star Fuels, Star Fire, and LLKL Trading are
Michael's alter egos, and LLKL Trading is Joseph's alter ego. Falcon and Falrey argue that
the Loughrans and Star Fuels commingled assets and ignored corporate formalities, while
the Loughrans used LLKL Trading, Star Fuels, and Star Fire to defraud Falcon and Falrey
for their own personal benefit. Second, Falcon and Falrey argue that Star Fire and LLKL
Trading are the alter egos of Star Fuels. Finally, Falcon and Falrey argue that MENSA is
the alter ego of Garcia. 

 Again, Falcon and Falrey rely on their pleadings to support their arguments, and
those pleadings do not sustain their burden of proof. See City of Wilmer, 904 S.W.2d at
660. Falcon and Falrey also cite generally to nearly 1500 pages of the evidence they
submitted in response to the special appearances without identifying any testimony from
any witness that supports their argument and without explaining how any of this testimony
satisfies their burden of proof. See Tex. R. App. P. 38.1(i). Accordingly, we overrule their
fifth, sixth, and seventh issues in this regard. 

IV. Minimum Contacts


 By their first, third, and fourth issues, Falcon and Falrey assert that the appellees
had minimum contacts with Texas sufficient to support the exercise of specific and general
jurisdiction. We disagree.

A. Applicable Law 

 "Texas courts may assert in personam jurisdiction over a nonresident if (1) the
Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of
jurisdiction is consistent with federal and state constitutional due-process guarantees."
Moki Mac River Expeditions v. Drugg, 221 S.W.3d 569, 574 (Tex. 2007). The long-arm
statute's broad language allows the statute to "reach as far as the federal constitutional
requirements of due process will allow." Guardian Royal Exch. Assurance, Ltd. v. English
China Clays, P.L.C., 815 S.W.2d 223, 226 (Tex. 1991). "Thus, the requirements of the
Texas long-arm statute are satisfied if an assertion of jurisdiction accords with federal
due-process limitations." Moki Mac River Expeditions, 221 S.W.3d at 575.

 In order for a trial court to exercise personal jurisdiction over a nonresident
defendant consistent with the requirements of due process, the defendant must have
established minimum contacts with the forum state, and the exercise of jurisdiction must 
comport with traditional notions of fair play and substantial justice. Id. "Minimum contacts
are sufficient for personal jurisdiction when the nonresident defendant purposefully avails
itself of the privilege of conducting activities within the forum State, thus invoking the
benefits and protections of its laws." Id. (quoting Hanson v. Denckla, 357 U.S. 235, 253
(1958)) (internal quotations omitted). The "purposeful availment" inquiry includes three
parts:

 First, only the defendant's contacts with the forum are relevant, not the
unilateral activity of another party or a third person. Second, the contacts
relied upon must be purposeful rather than random, fortuitous, or
attenuated. . . .  Finally, the defendant must seek some benefit, advantage
or profit by availing itself of the jurisdiction. In contrast, a defendant may
purposefully avoid a particular forum by structuring its transactions in such
a way as to neither profit from the forum's laws nor subject itself to
jurisdiction there.


Id. (internal citations and quotations omitted).

 "A nonresident defendant's forum-state contacts may give rise to two types of
personal jurisdiction." Id. If the defendant's contacts with the forum are continuous and
systematic contacts, general jurisdiction is established regardless of whether the
defendant's alleged liability arises from those contacts. Id. When a plaintiff alleges
specific jurisdiction, the minimum contacts analysis focuses on the relationship between
the defendant, the forum, and the litigation. Id. at 575-76. To support a finding of specific
jurisdiction, there must be a "substantial connection" between the defendant's contacts and
the operative facts of the litigation. Id. at 585. With these principles in mind, we turn to the
contacts alleged in this case.

B. Specific Jurisdiction

 Falcon and Falrey assert that the trial court had specific jurisdiction over the
appellees. In response, the appellees argue that none of the claims asserted by Falcon
and Falrey bear a substantial connection to the contacts and operative facts of the
litigation. We agree. 

 First, Falcon and Falrey alleged claims for civil theft against Garcia and MENSA. 
The civil theft claims arise from Garcia and MENSA's alleged taking of many tons of coal
and equipment that belonged to Falrey by locking Falrey and Falcon out of the mine. It is
undisputed that these alleged actions took place in Mexico. Thus, there is not a substantial
connection between the claims for civil theft and the contacts and operative facts of the
claims. See Id.

 Second, Falcon and Falrey claimed that Garcia and MENSA slandered and libeled
them by accusing Falcon of stealing coal from the mining operation at two meetings that
occurred in Laredo on January 24, 2003 and February 1, 2003, in front of King, the
Loughrans, and Amaro. The operative facts, however, do not show a substantial
connection to Texas. The subject of those slanderous statements were Falcon and
Falrey's performance of the contract in Mexico--thus, the operative facts regarding the
truth or falsity of the statement occurred in Mexico. The statements by Garcia were
directed to the Loughrans, allegedly to influence the Loughrans to cut Falcon and Falrey
out of the mining operation. The Loughrans, however, are not Texas residents but are
residents of Ireland. Falcon and Falrey do not allege that they suffered any injury to their
reputation in Texas. According to the petition, the only Texas residents to witness the
statements, King and Amaro, adamantly denied that Falcon had stolen any coal. Rather,
the only damage that occurred was suffered in Mexico where Falcon and Falrey were
allegedly prevented from continuing the mining project because of the slanderous
allegations. See Tabor, Chhabra & Gibbs, P.A. v. Med. Legal Evaluations, Inc., 237
S.W.3d 762, 775-76 (Tex. App.-Houston [1st Dist.] 2007, no pet.) (holding trial court did
not have specific jurisdiction over nonresident defamation defendant because Texas was
not the "focus" of the defamatory statement, where the alleged defamatory statement was
made to another nonresident about actions the plaintiff took outside the state of Texas). 
 Third, Falcon and Falrey pleaded a tortious interference claim against all the
appellees. Falcon and Falrey assert that all appellees interfered with and prevented
Falcon and Falrey from completing the mining operation successfully. Falcon and Falrey
list the following actions as constituting interference: (1) diversion of money owed to LLKL
Trading and the mining operation, which prevented LLKL Trading from paying Falcon and
Falrey; (2) direct interference at the mine as it was being constructed; (3) refusal to
reimburse money spent by Falcon and Falrey to develop the mine; (4) breach of the
agreement and representations to fund the necessary capital for the long-term
development of the mine; (5) Garcia and MENSA slandering Falcon and Falrey; (6)
preventing Falcon and Falrey from developing the mine in the long term; (7) locking Falcon
and Falrey out of the mine and unlawfully converting and using their equipment; and (8)
"other wrongful acts and omissions that destroyed the value of Mr. Falcon's and/or Falrey's
income interest in developing the property." 

 Nearly all of the operative facts allegedly supporting this claim occurred in Mexico. 
Although the petition alleged that LLKL Trading diverted money by paying Farco in Texas
for washing its coal, the tortious interference claim does not bear a substantial relationship
to Texas because the gist of the allegations is that Falcon and Falrey were prevented from
performing under the contract, and that performance was to occur in Mexico at the mine. 
See Alenia Spazio, S.P.A. v. Reid, 130 S.W.3d 201, 214 (Tex. App.-Houston [14th Dist.] 
2003, pet. denied) (holding there was no specific jurisdiction over breach of fiduciary duty
claim and conversion claim by Canadian citizen against Italian company, where the claims
were based on the alleged removal of the Canadian citizen from participation in a joint
venture to develop satellite technology and where the development would have occurred
in Italy and Russia); Moni Pulo Ltd. v. Trutec Oil & Gas, Inc., 130 S.W.3d 170, 174 (Tex.
App.-Houston [14th Dist.] 2003, no pet.) (holding that foreign plaintiff did not establish
specific jurisdiction over tortious interference claim based on negotiations that took place
outside of Texas where plaintiff alleged that money that could have satisfied his claims
passed through Texas). Additionally, the alleged slander by Garcia does not support
specific jurisdiction for the tortious interference claim for the same reasons we expressed
above. See Med. Legal Evaluations, 237 S.W.3d 776. And finally, although Falcon and
Falrey, who are not Texas residents, resorted to contracting with Texas residents to fulfill
their duties under the contract when LLKL Trading did not provide sufficient capital, we do
not consider Falcon and Falrey's unilateral actions when analyzing jurisdiction. Moki Mac
River Expeditions, 221 S.W.3d at 575. 

 Fourth, Falcon and Falrey alleged that Garcia and MENSA unlawfully converted coal
and machinery for their own use and benefit. Again, this alleged conversion occurred in
Mexico at the mine. Falcon and Falrey further alleged that the Loughrans and Star Fuels
took title to the coal produced by Falcon and Falrey and transported that coal for their own
use "without allowing any of the revenue to enure to the benefit of Falcon and Falrey." 
Although the petition alleges that the Loughrans and Star Fuels took possession of the coal
from Falcon and Falrey in Texas, the substance of the allegations is that Falcon and Falrey
were not paid in Mexico for the coal they mined in Mexico. Falcon and Falrey are not
Texas residents, and the only connection this claim has to Texas is that the coal passed
through Texas on its way out of the country. This is not a substantial connection to Texas,
as the entirety of the operative facts occurred in Mexico. See Moni Pulo Ltd., 130 S.W.3d
at 174.

 Fifth, Falcon and Falrey pleaded claims for quantum meruit, unjust enrichment, and
promissory estoppel against Garcia, MENSA, the Loughrans, and Star Fuels. These
claims are all based on Falcon's construction of "infrastructure" and roads at the mine with
the expectation of being paid a fee. The operative facts of this claim do not bear a
substantial relationship to any of the appellees contacts with Texas, as these facts
occurred in Mexico. 

 Sixth, Falcon and Falrey asserted a breach of contract claim and a fraud claim
against the Loughrans and Star Fuels based on the same operative facts. Falcon and
Falrey argue that the Loughrans and Star Fuels agreed to reimburse Falcon and Falrey for
their expenses incurred in relation to the mining operation and also to pay a commission
on the coal mined. In exchange, Falcon and Falrey agreed to serve as the mining
contractor. 

 Falcon and Falrey repeatedly point out that the Loughrans and Star Fuels entered
into a contract with a Texas resident--King. But merely entering into a contract with a
Texas resident is not enough to establish minimum contacts with Texas. See IRA Res.,
Inc., 221 S.W.3d at 597-98. It is even less significant when the Texas resident with whom
the defendant contracted is not the plaintiff. Falcon and Falrey, Mexican residents, are the
plaintiffs--King is no longer a part of this suit. Thus, we must examine the Loughrans' and
Star Fuels's contacts with Texas and their relationship to Falcon's and Falrey's claims. 

 It is undisputed that Falcon and Falrey's performance was to occur at the mine in
Mexico. Falcon and Falrey allege, however, that the contract between them, the
Loughrans, and Star Fuels was negotiated in Texas and that Star Fuels and the Loughrans
made payments to LLKL Trading in Texas. However, initiating contract discussions and
making payments to Texas when the entire substance of the contract is performed outside
the state is insufficient to establish jurisdiction. Alena Spazio, S.P.A., 130 S.W.3d at 213;
Blair Commc'ns, Inc. v. SES Survey Equip. Servs., Inc., 80 S.W.3d 723, 729 (Tex.
App.-Houston 2002, no pet.). 

 Furthermore, Falcon and Falrey allege that the Loughrans and Star Fuels breached
the contract and committed fraud by (1) failing to provide capital to successfully develop
the long-term mining operation; (2) refusing to pay Falcon and Falrey's expenses; (3)
converting coal and funds of LLKL Trading that would have been paid to Falcon and
Falrey; and (4) refusing to pay the promised commission. Any development of the mining
operation would have occurred in Mexico, and payment would have been made to Falcon
and Falrey in Mexico. Moreover, as alleged in the petition, the communications whereby
the Loughrans and Star Fuels allegedly refused to fund LLKL Trading originated in Ireland,
and the coal merely passed through Texas and was exported out of the state. See Moni
Pulo Ltd., 130 S.W.3d at 174. Under these circumstances, we cannot say that any breach
of the contract by the Loughrans or Star Fuels occurred in Texas. See Alenia Spazo,
S.P.A., 130 S.W.3d at 213. 

 Accordingly, we find that there is not a substantial connection between the
appellees' contacts with the state and the claims and operative facts of the litigation
sufficient to support the exercise of specific jurisdiction, and we overrule Falcon and
Falrey's first, third, and fourth issues in this regard.

C. General Jurisdiction (4)

 Falcon and Falrey further argue that general jurisdiction exists over all appellees. 
The appellees dispute that their contacts were continuous and systematic to justify the
exercise of general jurisdiction. We agree with appellees.

 1. Michael and Joseph Loughran

 With respect to Michael and Joseph, Falcon and Falrey make nearly identical
arguments and rely on almost the same evidence. They argue that general jurisdiction
exists because Michael and Joseph (1) made "regular personal visits to Texas in relation
to the mining operation;" (2) regularly traveled throughout Texas; (3) regularly made phone
calls, facsimiles, and e-mails to Texas and received the same from Texas; and (4)
transferred money to individuals and banks in Texas. Additionally, with respect to Michael,
Falcon and Falrey allege that he owned a majority of shares in LLKL Trading and was the
sole shareholder of Star Fuels, which wholly owned Star Fire. As to Joseph, they allege
that he owned the second-largest share of stock in LLKL Trading.

 First, to demonstrate the "regular personal visits to Texas in relation to the mining
operation," Falcon and Falrey point to one meeting in August 2002 in Corpus Christi, two
trips to Texas in October and November of 2002, and the meeting in Laredo on February
3, 2003. They further cite to Michael's deposition, where he confirmed the meeting in
August 2002 in Corpus Christi and mentioned a meeting in Laredo on an unspecified date. 
Additionally, they cite to a "chronology" apparently created by King, in which King claims
(1) he drove Michael from Laredo to the Houston airport on October 25, 2002; (2) the
Loughrans arrived in Laredo on November 1, 2002 and stayed for an unspecified amount
of time; and (3) the Loughrans came to Laredo on January 31, 2003 and stayed until
February 5, 2003. 

 Second, to support the allegation that Michael and Joseph "regularly" traveled
throughout Texas, Falcon and Falrey cite to the same meetings, and also to testimony from
Michael that every time he went to the mine in Mexico, he passed through Texas and
stayed in Laredo. However, Falcon and Falrey do not indicate the number of times that
actually occurred. Falcon and Falrey then point to what they call "travel records,"
consisting of over 100 pages of documents in the record, that they assert demonstrate the
Loughrans' regular travel to Texas. The documents are credit card statements for credit
cards issued to Michael and Joseph with the designation "Star Fuels Limited." 

 The first set appears to be for a card that was issued in Joseph's name. It shows
purchases at hotels and other businesses in Texas on various dates in (1) January,
February, March, and April 2003; (2) January, February, March, July, August, September,
October, November, and December 2002; and (3) August and October 2001. The second
set appears to be for a card that was issued in Michael's name. It shows purchases at
hotels and other businesses in Texas on various dates (1) in February, May, and July
2003; (2) in February, March, July, and August 2002; (3) in October 2001; (4) August,
September, and December 2000; (5) in January, July, August, and December of 1999; and
(6) in January, February, September, and October of 1998. Most of these credit card
statements, however, do not indicate whether those purchases were made in person, and
if so, who traveled to Texas on those dates or the purpose of those visits. (5) Additionally,
the evidence shows that on March 1, 2001, Michael traveled from New Orleans to
Monterrey, Mexico, stopping briefly for a layover in Houston. 

 At most, these credit card purchases merely show that Michael and Joseph visited
Texas a few times a year--not "regularly" as Falcon and Falrey allege. "[I]t is difficult to
say that two or three visits a year are continuous and systematic." See Moni Pulo Ltd., 130
S.W.3d at 179. 

 Third, Falcon and Falrey allege that Michael and Joseph regularly made and
received phone calls, facsimiles, and e-mails to and from Texas. To support this
allegation, Falcon and Falrey point to Michael's affidavit, which refers to communications
with King between September 2002 and January 2003 without specifically referencing
particular phone calls, facsimiles, or e-mails. Additionally, Falcon and Falrey refer to a
page in Michael's deposition where he testified that he made sales of coal to a company
named Oxbow, for whom King worked prior to the formation of LLKL Trading, and these
sales were made by phone or e-mail. It is not clear how often or when these sales were
made.

 Furthermore, Falcon and Falrey cite to their entire petition, which refers to the
following communications that did not occur in person: (1) in November 2002, the
Loughrans wired money to King in Texas and told King that more money would be coming;
(2) King sent a facsimile to the Loughrans in Ireland on January 2, 2003; (3) Joseph wired
money on January 6, 2003 and indicated by letter that no further funds would be advanced
until certain conditions were met; (4) on January 28, 2003 Joseph instructed King that he
was sending $48,500 with instructions that it be used for specific equipment payments; (5)
on January 29, 2003, Joseph sent a facsimile requesting that he be presented with a
detailed financial and engineering analysis; (6) on some unspecified date after February
3, 2003, Joseph spoke to King on the phone from Ireland; and (7) on February 15, 2003,
Michael spoke to King on the phone. Only two of these alleged conversations included
Michael--hardly enough to call them systematic and continuous on his part. See id. And
Joseph's contact was limited to only a few instances of wiring money and a few letters. 
See id.

 Fourth, Falcon and Falrey argue that Michael and Joseph made wire transfers to
individuals and banks in Texas. For this proposition, they again rely on Michael's affidavit
where he states that payments were made from Star Fuels to Falcon directly, which are
not alleged to have occurred in Texas, and that funds were advanced by Star Fuels to
LLKL Trading after its formation. We have held, however, that Star Fuels's actions cannot
be imputed to Michael or Joseph because Falcon and Falrey have failed to establish that
Star Fuels was the Loughrans' alter ego. Thus, we do not consider these wire transfers
as evidence of the Loughrans' contacts with Texas.

 Finally, Falcon and Falrey allege that Michael owned a majority of shares in LLKL
Trading and was the sole shareholder of Star Fuels, which wholly owned Star Fire. They
further assert that Joseph was the second-largest shareholder of LLKL Trading. 
"Generally, a court may not assert general jurisdiction over an individual based on that
individual's association with a corporation unless the corporation is the alter ego of the
individual." Ali-Turki v. Taher, 958 S.W.2d 258, 263 (Tex. App.-Eastland 1999, pet.
denied). We have rejected Falcon and Falrey's alter ego theory, and while ownership of
stock by a foreign defendant in a Texas corporation is a relevant contact, it is insufficient
to establish general jurisdiction. See id. In sum, although the Loughrans had contacts with
Texas, they are not enough to be considered continuous and systematic to support the
exercise of general jurisdiction. 

 2. Star Fuels 

 Falcon and Falrey allege that general jurisdiction exists over Star Fuels, pointing to
"direct" contacts and contacts made through its agents, principals, employees, and agents. As we stated above, Falcon and Falrey have waived their argument that King was
an agent of Star Fuels by failing to adequately brief that issue. Accordingly, we only
consider the contacts made by the Loughrans.

 Falcon and Falrey point to the same contacts we discussed above with respect to
Michael and Joseph, which we have held were not systematic and continuous. In addition,
Falcon and Falrey point to the following contacts: (1) coal purchases and occasional sales
in Texas since the 1990s; (2) making various wire transfers to individuals and entities in
Texas; (3) owning the majority of shares in LLKL Trading; (4) being the sole shareholder
of Star Fire; and (5) entering into a contract with King, a Texas resident.

 First, a corporation does not subject itself to general jurisdiction merely by making
purchases and "occasional" sales in Texas. See Helicopteros Nacionales de Colombia,
S.A. v. Hall, 466 U.S. 408, 417 (1984) (holding that general jurisdiction did not exist even
though the defendant purchased approximately eighty percent of its helicopter fleet from
a Texas seller and sent pilots and other personnel to Texas to be trained); see also
McElroy Machine & Mfg. Co., Inc. v. Flores, 13-08-00528-CV, 2010 WL 466901, at *3 &
n.3 (Tex. App.-Corpus Christi Feb. 11, 2010, no pet. h.). 

 Second and third, Falcon and Falrey allege that Star Fuels made several wire
transfers to Texas, pointing to Michael's affidavit in support of the special appearances,
and claim that Star Fuels owned part of LLKL Trading. Michael's affidavit refers to several
payments from Star Fuels to Falcon in September and October 2002. Falcon and Falrey
do not allege that these payments were made to them in Texas. Falcon and Falrey's
petition belies their argument that Star Fuels owned any of the shares in LLKL Trading:
they specifically alleged that the agreement was that LLKL Trading, Inc. was to be owned
according to the following percentages: (1) 33% by Michael; (2) 32% by Joseph; (3) 30%
by King; and (4) 5% by Leatherwood. And Michael testified that Star Fuels merely had
agreed to advance funds to LLKL Trading, Inc. After LLKL Trading was formed, Star Fuels
wired funds to King in Texas in October, November, and December 2002. Merely loaning
money to a Texas corporation is not sufficient to establish general jurisdiction. See IRA
Resources, Ltd. v. Griego, 161 S.W.3d 248, 257-58 (Tex. App.-Corpus Christi 2008), rev'd
on other grounds, 221 S.W.3d 592 (Tex. 2007). 

 Finally, it is undisputed that Star Fuels owns all the shares of Star Fire, which is a
Texas corporation. However, a foreign entity's ownership of stock in a Texas corporation
is not sufficient to demonstrate general jurisdiction over the foreign entity, and Falcon and
Falrey have waived their argument that Star Fire is somehow the alter ego of Star Fuels. 
Ali-Turki, 958 S.W.2d at 263. Accordingly, we hold that Star Fuels's contacts with Texas
were not continuous and systematic to such an extent that the exercise of general
jurisdiction is warranted. See Alenia Spazio, S.P.A., 130 S.W.3d at 220 (noting that even
a large quantity of contacts with Texas will not support general jurisdiction if the defendant
has not established a general business presence in the state). (6)

 3. Garcia

 To support the exercise of general jurisdiction over Garcia, Falcon and Falrey argue
that he (1) made regular personal visits to Texas and regularly traveled throughout Texas; (7)
(2) owned an apartment in San Antonio where he stayed several times a year for a week
or more; (3) maintained a Texas bank account; (4) regularly visited his daughter and
grandchildren several times per year; (5) regularly made or received phone calls,
facsimiles, and e-mails to and from Texas; and (6) wired money and paid individuals or
banks in Texas.

 For support, Falcon and Farley cite to Garcia's deposition testimony, a chronology
created by King, and their petition. Garcia testified that he has a daughter and
grandchildren that live in San Antonio. He stated that he had an automobile repaired in
San Antonio on one occasion on an unspecified date, and he listed an apartment his wife
owns as her separate property as the contact information for that repair. He denied that
he personally owned that apartment. He estimated that in 2002 and 2003, he visited that
apartment "three or four times a year" for a weekend or a week each time. He testified that
he may have charged dinner to his credit card on four occasions in San Antonio, but those
charges may have been made by his wife, and it is not clear when these charges occurred. 
Garcia admitted that he had a personal checking account in Texas at the International
Bank of Commerce in Laredo and that it was funded by sending wire transfers to the bank
in Texas, but there is no evidence in the record demonstrating how often or for what
purposes this bank account was used. 

 Garcia testified he sent a fax and admitted sending e-mails to King in Texas in
September 2002. Garcia explained that he came to Laredo in 2002 and 2003 on "several"
occasions related to the mining operation. Specifically, he stayed at the Holiday Inn in
Laredo when he met with the Loughrans and King regarding the mining project. Falcon
and Falrey refer to King's chronology, which notes that Garcia attended a meeting on
February 3, 2003 in Laredo. Falcon and Falrey further point to their petition, which alleges
that the parties met again on February 4, 2004, in Laredo with Garcia's accountants and
lawyer. 

 We cannot say that these few, isolated contacts are "regular," as characterized by
Falcon and Falrey. A bank account in Texas, by itself, is insufficient to assert general
jurisdiction over a nonresident. El Puerto De Liverpool, S.A. de C.V. v. Servi Mundo
Llantero S.A. de C.V., 82 S.W.3d 622, 631 (Tex. App.-Corpus Christi 2002, pet. dism'd
w.o.j.) ("In accordance with the standard rules regarding minimum contact analysis, use
of the account must be continuous and systematic in order to support the exercise of
general jurisdiction."). Garcia testified that he did not own an apartment in San
Antonio--that testimony was undisputed. The evidence shows merely a few trips to Texas
a year, a few purchases in Texas that may or may not have been made by Garcia's wife,
totally unrelated to the causes of action alleged, and a few calls, e-mails, or faxes to Texas. 
Under these circumstances, we hold that the evidence was legally and factually sufficient
to support the trial court's refusal to exercise general jurisdiction. See PHC-Minden, L.P.,
235 S.W.3d at 170-71 (holding that a few trips to Texas, purchases from Texas vendors,
and contracts with Texas residents did not satisfy demanding general jurisdiction inquiry).

4. MENSA

 With respect to MENSA, Falcon and Falrey rely on the contacts they alleged Garcia
had with Texas, which we have held are insufficient to establish general jurisdiction. See
id. Additionally, they argue that the contacts of Garcia's son, Jose, should be considered. 
Jose traveled with Garcia to the meetings regarding the mining contract. Relying on
Garcia's testimony, Falcon and Falrey argue that MENSA purchased jute from a company
in Eagle Pass, Texas on some unspecified date and, through e-mails from Jose, attempted
to purchase some equipment from a Texas company named Russell and Sons in March
2003, after the mining contract terminated. Furthermore, Falcon and Falrey argue that
MENSA had a bank account at the International Bank of Commerce in Laredo, Texas. 
Garcia testified he was not sure how they made deposits into that account but assumed
it was through wire transfers, and he did not provide any detail as to how often or for what
purposes that account was used. The evidence against MENSA is nearly identical to that
of Garcia, and it fails for the same reasons. See id. Accordingly, we hold that the
evidence was legally and factually sufficient to support the trial court's implied finding that
it lacked general jurisdiction over MENSA., and we overrule Falcon and Falrey's first, third,
and fourth issues. (8) 

V. Conclusion 


 The trial court's order dismissing Falcon and Falrey's claims against appellees is
affirmed.

 _______________________________

 GINA M. BENAVIDES,

 Justice

 

Delivered and filed the

24th day of June, 2010.
1. Originally, Cullis Lee King was a plaintiff in this case, but he settled with the appellees.
2. Falcon and Falrey also sued LLKL Trading, Inc. and Star Fire Port Services, Inc. LLKL Trading, Inc.
filed a suggestion of bankruptcy and then removed the case to the Bankruptcy Court for the Southern District
of Texas, Laredo Division. The case was remanded back to state court, and the record reflects that the claims
against LLKL Trading, Inc. and Star Fire Port Services, Inc. have not been disposed.
3. James Leatherwood was an employee of Star Fire. 
4. In support of nearly every argument addressed in this section, Falcon and Falrey cite in their brief
to specific pieces of evidence in the record and then also generally cite to nearly 1500 pages of the evidence
they submitted in response to the special appearances without identifying any testimony from any witness that
supports their argument and without explaining how any of this testimony supports their argument. See Tex.
R. App. P. 38.1(i). We are not required to sort through over 1500 pages of evidence to concoct an argument
that will support reversal of the trial court. Accordingly, we do not address evidence not specifically referenced
in the brief.
5. Two of the statements show the purchase of airfare and provide passenger names. Michael and
Joseph purchased airfare from Corpus Christi to Houston on April 28, 2003, and Michael purchased a trip on
September 1, 2000. Otherwise, the purchaser or traveler is not identified. 
6. Falcon and Falrey rely heavily on our opinion in Villagomez v. Rockwood Specialties, 210 S.W.3d
720, 728 (Tex. App.-Corpus Christi 2006, pet. denied), where we held that a parent corporation could be
subject to jurisdiction in Texas based on its numerous contacts and interactions with its three subsidiaries in
Texas, two of which were managed by a Texas resident with whom the parent corporation contracted. That
case is not on point with the facts of this case, given that Star Fuels only owns the stock in one Texas
corporation, Star Fire, and there is no evidence of the extent of the contact between Star Fuels and Star Fire. 
7. Falcon and Falrey argue that contacts made by Jose in Texas can be attributed to Garcia because
Jose is MENSA's agent and MENSA is Garcia's alter ego. But we have rejected their alter ego argument;
therefore, we will only address Garcia's contacts with Texas.
8. Because we have held that the trial court lacked general and specific jurisdiction over all appellees,
we need not address Falcon and Falrey's arguments that the exercise of jurisdiction comports with fair play
and substantial justice. Tex. R. App. P. 47.1.